[No. 36949.   Department One.   April 23, 1964.]

RAYMOND E. MAGERSTAEDT *et al., Appellants,* v. THE ERIC COMPANY *et al., Respondents.**

*Preston, Thorgrimson, Horowitz, Starin & Ellis,* for appellants.

*Lycette, Diamond & Sylvester* and *John P. Lycette, Jr.,* for respondents.

HILL, J.—The plaintiffs, Raymond E. Magerstaedt and Maxine Magerstaedt, his wife, owned and operated a restaurant in space which they leased on the street floor of a

*Reported in 391 P. (2d) 533.

seven-story building. After they had occupied this space for almost 5 years, the ceiling (plaster and metal lath) over part of the area occupied by them[1] fell,[2] causing considerable property damage; and, in consequence thereof, Mrs. Magerstaedt sustained some personal injuries. The restaurant was closed for 3 weeks while the entire ceiling was replastered and the premises repainted.

The plaintiffs brought this action to recover damages against their lessor, the owner of the building, and also the contractor who was, at that time, preparing the premises adjacent to the plaintiffs for a new tenant, the Washington State Liquor Control Board. The same contractor had, during an earlier period, made substantial changes and alterations in the upper floors of the building including the second floor immediately above the premises occupied by the plaintiffs. They alleged negligence against the lessor and the contractor for the manner in which the work had been done and for failure to provide proper and necessary support for said plaster ceiling.[3]

At the conclusion of the plaintiffs' case, the trial court dismissed the action on the basis that the terms of their lease prevented any recovery against the lessor, unless its actions in altering and renovating other parts of the building had caused the damage, and that there was no evidence that any such action had caused the ceiling to fall, and that no actionable negligence had been established.

The plaintiffs appeal.

The plaintiffs had leased the premises for 5 years (from April 1, 1956) from University Building Company, a corporation, a former owner of the building. In 1958, the defendant, The Eric Company, a corporation, had become the owner of the building; and in February, 1961, the plaintiffs had executed a renewal lease for another 5-year period with

---

[1]Based on the area designated by Mr. Magerstaedt, by marking it on one of the exhibits, we would compute it at not to exceed 5½-by-15 feet.

[2]March 13, 1961.

[3]On this appeal, they also claim damages on the basis of a breach of an implied covenant of quiet enjoyment.

that company; however, the first 5-year lease had not yet expired when the ceiling fell.

The trial court, speaking of these leases, said:

"The lease which was signed, and which was again renewed shortly before this occurrence, has the following provisions that I deem applicable to this situation.

"It states in the third paragraph: [4] 'That the lessee,' that is the Plaintiff here, 'has examined the above described premises and accepts said premises with their appurtenances and fixtures in their present condition and finds the same to be in good repair,' which is quite a recital, at least at the time of the renewal here, 'and hereby covenants and agrees to keep all thereof in good repair, and further agrees to make all necessary repairs of whatsoever nature to the same, except, however, repairs to the structural bearing parts of the building, the roof, exterior walls and foundation.'

"I will rule as a matter of law that the ceiling here was not a structural bearing part of this building.

---

[4]"Third. That the lessee has examined the above described premises and accepts said premises with their appurtenances and fixtures in their present condition and finds the same to be in good repair and hereby covenants and agrees to keep all thereof in good repair; and further agrees to make all necessary repairs of whatsoever nature to the same, except, however, repairs to the structural bearing parts of the building, the roof, exterior walls, and foundation, and the lessee agrees to replace with glass of the same kind and quality any and all glass now or hereafter in said premises that may be injured or broken, except lessor shall replace all glass broken by fire or the elements. Lessee acknowledges that the glass now in said premises is whole and in good condition, and at the expiration of this lease will deliver up the demised premises in as good condition as they are now in, excepting the ordinary wear and tear thereof and damage by the elements or fire. Nothing in this paragraph contained shall release the lessee from liability for any damage to the roof, exterior walls, structural bearing parts, or foundation caused by the lessee, its agents or employees, or the lessee's occupancy of said premises, nor shall the lessor be liable to the lessee or to any person whomsoever for any damages caused by the roof, exterior walls, structural bearing parts, or foundation being out of repair unless the lessor shall fail to commence repairs upon the same within ten days after receipt of notice in writing from the lessee specifically pointing out the defect to be repaired and shall thereafter fail to proceed with reasonable diligence (excepting as in paragraph eleventh provided) to remedy such defect, nor shall the lessor be under any obligation to make any repairs whatsoever while the lessee is in default hereunder."

"The sixth provision[5] is broader. It provides that 'the lessee,' that is the Plaintiff, 'will not hold the lessor liable for any damages to property or persons caused by or arising out of any defect in the construction, maintenance, or use of the premises, their fixtures, appurtenances, or of the building fixtures and appurtenances of which the premises constitute a part.'

" . . .

"This warranty says that the lessee, the Plaintiff, will not hold the lessor liable for any damage to property or persons caused by any defect in construction or maintenance.

"I believe I would interpret that to be a good contract, if written instruments are to have any meaning at all.

"The fact that people carelessly do not read the fine print can be no defense, but I would interpret that to mean any defect in the construction or maintenance, meaning the present construction and ordinary maintenance—any damage he commits, to property or persons, caused by defect in construction or maintenance—I believe that is the present construction and ordinary maintenance of the building, and I do not believe that would protect them from damages caused by an unusual circumstance; remodeling of the building."

Supporting the position of the defendant-lessor, that these provisions of the contract bar any action against it, and construing language of somewhat similar import is our unanimous en banc opinion in *Griffiths v. Henry Broderick, Inc.* (1947), 27 Wn. (2d) 901, 182 P. (2d) 18, 175 A.L.R. 1.

We have here no issue of fraud—no contention that the plaintiffs did not understand the contract they were signing with the lessor. As the trial court said,

"I believe I would interpret that to be a good contract, if written instruments are to have any meaning at all."

---

[5]"Sixth. That the lessee will not hold the lessor liable for any damages to property or persons caused by, or arising out of:

"(a) Any defect in the construction, maintenance, or use of the demised premises, their fixtures and appurtenances, or of the building, fixtures and appurtenances of which the demises premises constitutes a part.

"(b) Water coming from the roof, water pipes, boilers, heating pipes and plant, plumbing fixtures, waste pipes, or any source whatsoever, whether within or without the demised premises.

"(c) Any act or omission of other occupants of the said building."

However, we will consider the case on the same bases that the trial court used in entering the judgment of dismissal.

The trial judge indicated, in the language which we have quoted, that, in his opinion, the lease provisions would not protect the lessor from the liability for damages caused by any unusual circumstance such as the remodeling of the interior of the building.

He discussed the issue of causation from two points of view: (a) was there any causation between the remodeling done by the lessor (through its contractor, the defendant E. F. Shuck Construction Company) on the upper floors or in the adjacent space to the north, and the falling of the ceiling; and (b) was there any causation between the negligence, if any, of the contractor in doing such work and the falling of the ceiling. Concerning (a), he pointed out that the burden is upon the plaintiff to show that the falling of the ceiling was not caused by any defect in construction or maintenance, but by the remodeling. He said:

" . . . then we have the next question of whether or not there has been a causal relation shown from which the jury could find from the evidence, rather than speculation, that the proximate cause of this piece of plaster falling was some act done in carrying on the remodeling.

"Now, if there had been any of this throwing around of two by fours, or placing heavy weights directly above this point, or wheeling wheelbarrows over it, done within some reasonable time, say thirty days, it might create a question, but here it was, according to the testimony, probably over a year before, except as to work done in a liquor store. . . ."

The work done on the premises to be occupied by the Washington State Liquor Control Board, immediately adjacent to the premises occupied by the plaintiffs, had involved prying on a wall between the two premises causing plaster to fall from the restaurant wall (which plaster was replaced by the construction company), and had caused the wall to give.

The trial judge properly concluded that there was a hiatus of proof as to any connection between the prying on the

wall and the falling of a section of the ceiling more than half way across the premises from the wall which had been pried. Had there been a connection between any of the claimed acts of negligence and the falling of the ceiling on the plaintiffs' premises, the proof was as readily available to the plaintiffs as to the defendants. As the trial judge said,

"I cannot find that there is evidence from which the jury can make those findings by the preponderance of the evidence.

"I find that there is an equal probability that . . . this plastering was old and defective . . . that would be a defect in construction."

The lease specifically insulated the lessor from any damage to persons or property "arising out of any defect in the construction, maintenance, or use of the demised premises."

With reference to (b), *i.e.,* causation between the claimed negligence of the defendant-contractor and the falling of the ceiling, the situation on the issue of causation is the same. The claimed acts of negligence, as listed, are:

"(1) Punching holes in the ceiling over appellants' restaurant . . .

"(2) Allowing water to overflow on the second floor directly over appellants' restaurant . . .

"(3) Throwing lumber down on the second floor directly over appellants' restaurant . . .

"(4) Constructing a ramp across which wheelbarrows of building material were transported directly over appellants' restaurant . . .

"(5) Failing to make adequate inspection of the ceiling over appellants' restaurant after the collapse of the portion of the ceiling in an area adjacent to appellants' restaurant . . .

"(6) Prying on the common wall between appellants' restaurant and an area adjacent thereto, which prying knocked plaster from the walls of the restaurant and caused a restaurant wall to 'give' . . ."

Several of these seem to us to be no more than normal operating procedure in an extensive remodeling of a seven-story building; but, assuming that all, except "(5)" which is a claimed failure to inspect, did constitute negligence,

"(2), (3)" and "(4)" had all occurred more than a year before the ceiling fell and were too remote to require any serious consideration.

"(1)" involved the punching of holes in the ceiling over a balcony. These holes were in a portion of the ceiling over the balcony at the western end of the plaintiffs' premises, which did not collapse and which was some distance removed from the section near the front entrance at the eastern end of the premises which did collapse. Repairs were immediately made after the punching of each hole. There is no testimony that these mishaps had anything to do with the fall of the section of the ceiling with which we are here concerned.

"(6)," the prying of the common wall in connection with the remodeling next door for the liquor store, which knocked plaster off the wall in the plaintiffs' premises, is the closest in point of time to the falling of the ceiling which caused the damage to the plaintiffs. There is no evidence that the so-called "prying" affected the ceiling, and no explanation of how it could have caused the metal lath, over which the plaster was placed, to break loose from the joists.

"(5)" is predicated on a failure to inspect the ceiling after the fall of a four-by-eight section of the ceiling in the premises being remodeled for a liquor store, which occurred more than a month earlier. The ceilings were of different construction; the ceiling over the plaintiffs' premises being plaster over metal lath, while the plaster which fell on the liquor store premises had been placed on "button board, or plasterboard," and the plaster which fell was from one four-by-eight section of the "button board, or plasterboard."

The superintendent for the contractor, called as an adverse witness, testified that after this plaster fell he did inspect the ceiling over the premises occupied by the plaintiffs and saw nothing wrong with it. There is no suggestion of what further inspection should have been made, or what it would have disclosed.

The plaintiffs, in their brief as appellants, say:

"It would be virtually impossible to state with certainty

which act of negligence led to the collapse of the ceiling. It may well be that all acts contributed in some manner. But at least the plaintiffs were entitled to have a jury consider whether or not some or all of the acts of negligence proximately caused damage and injury to appellants. . . ."

We disagree with the conclusion that, with absolutely no evidence of causation, a jury is entitled to guess whether some or all of the claimed acts of negligence proximately caused the ceiling to fall. This rises no higher than multiplied speculation and conjecture in an area where reasonable certainty was possible. The plaintiffs fail to show how the metal lath was affixed to the joists. To have proved a case for the jury, a plastering contractor, a building contractor, or someone familiar with construction should have testified to the type of construction and, at least, suggested one or more things that could have caused the plaster and metal lath ceiling to fall. The plaintiff Raymond Magerstaedt, in his testimony, suggested that the ceiling "had been up there since 1889, or something like that."

It would appear that the plaintiffs were depending on res ipsa loquitur to carry the case to the jury and to put the burden of going forward with exculpatory evidence on the defendants.

For various reasons, res ipsa loquitur has no application in this case.

In the first place, the plaintiffs proved six acts of claimed negligence which, they say, may separately or collectively have caused the section of plaster ceiling to fall. What further negligence is to be inferred? Actually, the situation is that the plaintiffs offer proof of claimed negligence, but rely on res ipsa loquitur to prove causation and thus carry the case to the jury. This would require some other Latin phrase meaning: Having proved negligent acts, it will be inferred that the claimed negligent acts caused the event which occasioned the damages. The contention here is not that there may be some other act of negligence to be inferred, beyond the six we have discussed, but that the jury should consider "whether or not some or all of the acts of

negligence proximately caused damage and injury to appellants." Having proved the negligence, it must still be proved, absent such a suggested phrase, that some act of negligence was a proximate cause of the happening which has resulted in the damages to persons and property which the plaintiffs seek to recover.

▇ In the second place, res ipsa loquitur has no application where a tenant sues his landlord for personal injuries or property damage caused by the falling of plaster from a ceiling of the leased premises. As the cases indicate, it is difficult to conceive of a situation where the landlord has such control of the floor or the ceiling of leased premises as makes it possible to say that he has such exclusive control, management, or special knowledge of the condition thereof as would support the applicability of res ipsa loquitur.

Plaster falling on a customer in a hotel room, a store, or a theatre where the owner or operator has the exclusive control of the ceiling and the means of knowledge superior to those of the plaintiffs in such cases, has caused many courts to say res ipsa loquitur applies. *McCleod v. Nel-Co Corp.* (1953), 350 Ill. App. 216, 112 N. E. (2d) 501, reviews many of the decisions.

However, we find no plaster-falling-from-the-ceiling case where res ipsa loquitur has been applied when the relationship was that of landlord and tenant, and *McCleod v. Nel-Co Corp.*, *supra*, recognizes the distinction. Res ipsa loquitur was discussed in *Wadleigh v. Bumford* (1918), 229 Mass. 122, 118 N. E. 265, where the plaintiff, a tenant, was injured when the ceiling of her kitchen fell. Two weeks previously the ceiling had been replastered by an agent of the defendant, the lessor. The court there said:

" . . . Other than such inference as may be drawn from the fall of the plaster, no evidence was offered to prove either faulty composition of the material used or unskilled and unworkmanlike application of the coating to the ceiling. Nor was there any evidence to exclude the inference of the operation of other causes which might have produced the accident. We are of [the] opinion that the mere occurrence of the accident raised no presumption against the defendant." (p. 123)

Another statement, on the reason for refusing to apply res ipsa loquitur in landlord-tenant cases involving falling plaster, is found in *Slater v. Barnes* (1925), 241 N. Y. 284, 149 N.E. 859, where a tenant sued the landlord for damages caused by the fall of plaster from the ceiling in an apartment. The trial court tried the case on the theory that res ipsa loquitur would take the case to the jury. A judgment for the plaintiff was reversed, the court saying:

". . . That rule [res ipsa loquitur] amongst other things is predicated upon the condition that the agency which has produced an injury is within the exclusive possession, control and oversight of the person charged with negligence whence, legitimately, flows the inference that if there is any explanation of the accident consistent with freedom from negligence, he ought to be able to give that explanation, and if he does not give it, a presumption arises against him. The reason for and common sense of this rule under such conditions is obvious. It frequently happens in the law that if a person fails to explain that of which apparently he has knowledge the presumption goes against him. (*Griffen v. Manice*, 166 N. Y. 188.)

"But that condition did not exist at all in this case. This piece of plaster, on plaintiff's theory, had remained in place for four years without so far as appears any sign of weakness or unsafe condition as the result of negligent repair in 1913. We can imagine that a variety of causes might have made it fall after a lapse of four years. But however many or potential these causes may have been there is nothing to indicate that the defendant had any opportunity to observe them. He was not in possession of the premises or at a post of observation and, therefore, when the trial judge erroneously imposed upon him this duty of explanation of something which happened beyond the realm of his observation or control, he in effect instructed the jury to find a verdict against him." (p. 287)

One of the most interesting cases involving falling ceiling plaster is *Asheim v. Fahey* (1943), 170 Ore. 330, 133 P. (2d) 246, 145 A.L.R. 861. The defendants were tenants of a building in Portland. They occupied the second floor of the building and sub-leased to others two storerooms on the street floor. In one of these storerooms plaster fell from

the ceiling onto the plaintiff, who was an employee and also an officer of the corporate sub-tenant.

As in the present case, the trial court had dismissed at the conclusion of the plaintiff's case; and the Supreme Court concluded its opinion with these words:

"We are of the opinion that the plaintiff failed to introduce sufficient evidence of negligence to take the case to the jury, and that, because of the fact that the defendants did not have exclusive possession or control of the demised premises, the doctrine of res ipsa loquitur does not apply. The learned trial judge was correct in his ruling on defendants' motion for involuntary nonsuit. The judgment is affirmed." (p. 344)

As we pointed out in *Chase v. Beard* (1959), 55 Wn. (2d) 58, 65, 346 P. (2d) 315, res ipsa loquitur is a mere rule of evidence which permits a jury to infer negligence or want of care from the proof of injury and attendant circumstances. Professor Wigmore points out that its particular force and justice consists in the circumstance that the chief evidence of the true cause is practically accessible to the defendant but inaccessible to the injured person. 9 Wigmore, Evidence (3d ed. 1940) § 2509.

In the present case, there was no element of exclusive control of the ceiling in the defendant; and the evidence of what caused the plaster to fall was equally accessible to both parties.

We find no cases, and the plaintiffs-appellants cite none, where res ipsa loquitur has been applied to take a tenant's case against a landlord to the jury where the action involved damages from falling plaster.

The appellants, in their briefs on appeal, suggest for the first time (so far as the record before us discloses) that they were entitled to maintain an action ex contractu on the theory of a breach of the implied covenant of quiet enjoyment. This theory of recovery, not having been presented to the trial court, will not be considered. *Malstrom v. Kalland* (1963), 62 Wn. (2d) 732, 384 P. (2d) 613. However, unless the landlord is an insurer that the ceiling will

not fall, we fail to see what has been done that breached any covenant of quiet enjoyment.

The judgment of dismissal is affirmed.

OTT, C. J., HUNTER and HALE, JJ., and RUMMEL, J. Pro Tem., concur.

July 16, 1964. Petition for rehearing denied.